UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WAYMAN TURNER,<br>Plaintiff,<br><br>v.<br><br>A.T. WALL, JOSEPH DINITTO, and<br>JAMES WEEDEN,<br>Defendants. | C.A. No. 14-196-JJM-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Wayman Turner, an inmate in the custody of the Rhode Island Department of Corrections ("RIDOC") and proceeding *pro se*, alleges that the RIDOC director and his employees unlawfully retaliated against him by assigning him a High Security classification at the Rhode Island Adult Correctional Institutions and then transferring him to Florida because he had filed a lawsuit against RIDOC. For the following reasons, the Court GRANTS the Defendants' Motion for Summary Judgment. ECF No. 162.

I. BACKGROUND

The Court has chronicled many of the facts in this case in a previous order. *See* ECF No. 74 at 2–5. Because the First Circuit remanded this case on the sole issue of Mr. Turner's claims of retaliation (ECF No. 90), the facts will be limited to those necessary to analyze and decide that issue.

A.  The 2006 Lawsuit

In 2006, Mr. Turner filed a lawsuit against RIDOC alleging that another inmate who was his known enemy assaulted him and that RIDOC was negligent by housing them together. *See Turner v. Wall*, No. 06-505 (D.R.I. Nov. 22, 2006), ECF No. 1. Following the assault, RIDOC transferred Mr. Turner to a prison in Virginia. The parties ultimately settled this 2006 lawsuit in March 2012. The settlement agreement provided in part that RIDOC would bring Mr. Turner back to Rhode Island. In relevant part, the settlement agreement stated:

> The State of Rhode Island shall cause Wayman Turner to be returned to the custody of the State of Rhode Island, Adult Correction Institutions (ACI), where *he will initially be housed at the High Security Facility*. Further decisions on classification/housing and/or the terms and conditions of Turner's confinement will be pursuant to the laws of the State of Rhode Island and any applicable Department of Corrections (DOC) policies and procedures, as is the case with the rest of the inmate population. . . . *[N]othing contained herein restricts the DOC from transferring or reassessing Turner's classification*, which shall be based on the health, safety, welfare, and housing of Turner, other inmates, DOC staff and/or visitors, as is the case with the rest of the inmate population.

ECF No. 163-2 at 5 (emphasis added).

B.  **Mr. Turner Returns to Rhode Island – The Classification Board**

Upon his return to Rhode Island in 2012, RIDOC placed him in its High Security Facility.[1] Soon after, Mr. Turner wrote a letter to RIDOC Warden James Weeden stating that he "fe[lt] it would be in [his] best interest" not to transfer directly from High Security to Medium Security, which he predicted "would be rough." ECF

---

[1] In the RIDOC classification system, "High Security" is a more restrictive setting than "Maximum Security," which in turn is a more restrictive setting than "Medium Security."

No. 163-10 at 2. Rather, Mr. Turner requested that RIDOC transfer him to Maximum Security first before transferring him to Medium Security. He admitted that one of his listed enemies was in Maximum Security, but claimed that this would not be an issue.[2]

Mr. Turner went before the RIDOC Classification Board on at least six occasions. *See* R.I. Gen. Laws § 42-56-31 (explaining duties and role of the Board). Following these hearings, the Classification Board forwarded its recommendations to the RIDOC director, who had final authority to approve or deny the Board's recommendations.[3] *See id.*

On two occasions during this period, Director Wall did not follow the recommendations of the majority of the Classification Board concerning Mr. Turner. Director Wall testified that "[i]n reviewing any request regarding Plaintiff's classification or transfer, [he] considered the length of his sentence, the date he would be eligible for parole, his disciplinary history in Rhode Island and Virginia, his ongoing enemy issues, and his instrument custody level score." ECF No. 163-4 at 4.

---

[2] It is undisputed in the record that Mr. Turner had an ongoing enemy issue in Maximum Security that prevented his transfer there. Mr. Turner himself admitted that he and another inmate "could have issues" if they were in the same facility. ECF No. 163-5 at 8. The other inmate made similar statements to RIDOC investigators. An investigation into the issue, as requested by Mr. Turner, resulted in a recommendation that he remain in High Security.

[3] "[T]he director of the Department of Corrections is given total and exclusive *final* discretion in the classification and housing of persons committed to his custody." *Bishop v. State*, 667 A.2d 275, 277 (R.I. 1995); *see McManus v. Wall*, 29 F. App'x 618, 619 (1st Cir. 2002) (per curiam) ("Rhode Island has not created a protected liberty interest in its prison classification system."). There is also no constitutional right relating to interstate or intrastate prison transfers. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Meachum v. Fano*, 427 U.S. 215, 225 (1976).

He "did not consider any litigation Plaintiff was involved in." *Id.* Director Wall also testified that he "made decisions based on the safety of Plaintiff as well as the safe and smooth running of RIDOC." *Id.*

After Director Wall rejected the recommendation of the Classification Board for the second time, Mr. Turner sought an explanation. Director Wall wrote to Mr. Turner:

> I have reviewed your institutional record with respect to your discipline history. Prior to sending you to the Virginia Department of Corrections you were considered a problematic inmate. Reports from Virginia also suggest that you were engaged in a number of disciplinary actions.

*Id.* at 23.

Mr. Turner then wrote back, requesting to stay in Rhode Island. Director Wall informed Mr. Turner that "[i]t is not at present our intention to send you out of state to serve your sentence." *Id.* at 24. He told Mr. Turner that he was "comfortable with [his] decision to classify [Mr. Turner] to High Security (HS) 'B' status with a 90-day review." *Id.* He explained to Mr. Turner that this "decision was based on [Mr. Turner's] instrument custody level score of twenty (20), [his] sentence length, [his] parole eligibility date as well as [his] institutional record."[4] *Id.*

### C. Second Lawsuit

Mr. Turner filed this complaint against Director Wall, Warden Weeden, and Associate Director DiNitto. He alleged that the Defendants "unconstitutionally deprived and turned deliberate indifferent [sic] to Plaintiff's liberty interest in

---

[4] In reviewing Mr. Turner's classification, the Board often referenced these same criteria in its decisions.

4

avoiding assignment to High Security Prison (Super Max) . . . in retaliation for Plaintiff successfully settling a previous lawsuit." ECF No. 1 at 2–3.

Mr. Turner also filed a Motion for a Temporary Restraining Order seeking "a preliminary injunction, ordering [RIDOC] and its agents, to keep Plaintiff in the Rhode Island prison system until he is through litigating his current Complaint." ECF No. 5 at 2. In a letter to the Court, Mr. Turner claimed that he was requesting an injunction because "if [he was] not granted these motions the Defendants in this case [will] surely move [him] across the country." ECF No. 2-1 at 1.

### D. Request to Transfer Out-of-State

Three days after asking for a Court order to remain in Rhode Island, Mr. Turner requested a voluntary transfer out of Rhode Island. ECF No. 163-7 at 5–8. That same day Mr. Turner sent a letter to Defendant Joseph DiNitto, Associate Director of Classifications at RIDOC, stating that he had "just signed the paperwork to go back out of state." *Id.* at 8. He acknowledged that his transfer request could result in him being transferred back to Virginia "or even further away." *Id.*

RIDOC is a member of the Interstate Corrections Compact, under which participating states "may share information and enter into contracts for the mutually beneficial transfer of prisoners." *See* ECF No. 163 at 4. Pursuant to RIDOC policy, it sent Mr. Turner's transfer package to other member states of the Interstate Corrections Compact following his voluntary transfer request.

The Florida Department of Corrections informed RIDOC that they would accept Mr. Turner as an Interstate Corrections Compact transfer inmate. ECF No.

5

163-7 at 10. This was the first corrections department to accept Mr. Turner. RIDOC thereupon transferred Mr. Turner to the Florida Department of Corrections.[5]

Mr. Turner arrived at the Florida Department of Corrections and within a few weeks he had filed a Motion for a Preliminary Injunction, requesting that the Court order RIDOC to transfer him out of Florida. ECF No. 8. At that time, Mr. Turner had not requested a transfer back to Rhode Island or sought any administrative remedies. The Court denied Mr. Turner's Motion for a Preliminary Injunction because he had not yet exhausted his administrative remedies before seeking the injunction. ECF No. 31. Thereafter, by letter to Associate Director DiNitto, Mr. Turner requested that RIDOC transfer him back to Rhode Island or to a facility elsewhere in New England. ECF No. 36. In accordance with Mr. Turner's request, he was transferred temporarily back to Rhode Island on April 6, 2015, and then to MCI Cedar Junction, a facility of the Massachusetts Department of Corrections, where he remains.

E. Amendment, Dismissal, and Remand

Mr. Turner amended and supplemented his complaint to add claims that the Defendants also retaliated against him for filing the instant lawsuit (in addition to the 2006 lawsuit). ECF No. 19. The Defendants moved to dismiss (ECF Nos. 35, 40), resulting in the Court dismissing all of Mr. Turner's claims (ECF No. 74).

Mr. Turner appealed the dismissal to the First Circuit Court of Appeals. ECF No. 77. That court found that, "while the due process claim was properly dismissed,

---

[5] While Mr. Turner was incarcerated at the Florida Department of Corrections he was classified pursuant to Florida Statute § 944.1905. ECF No. 163-8 at 2.

6

the allegations of retaliation were minimally sufficient to withstand dismissal under Rule 12(b)(6)." ECF No. 90. Upon remand, and after full discovery, the Defendants filed this Motion for Summary Judgment. ECF No. 162. The only matter remaining before this Court is Mr. Turner's claim of retaliation based upon his assignment to High Security and his transfer to Florida.

## II. STANDARD OF REVIEW

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law identifies the facts that are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "In deciding a summary judgment motion," this Court "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor." *Sparks v. Fid. Nat'l Title Ins. Co.*, 294 F.3d 259, 265 (1st Cir. 2002).

## III. DISCUSSION

Mr. Turner asserts that the RIDOC Defendants retaliated against him for filing lawsuits in two ways: by classifying him at High Security status and by transferring him to Florida.

For each theory to survive summary judgment, Mr. Turner must present evidence of three elements: "[1] that he engaged in protected activity, [2] that defendants took an adverse action against him that would deter a prisoner of ordinary

7

firmness from continuing to engage in that conduct, and [3] that the action would not have been taken 'but for' the alleged improper reason." ECF No. 90 at 2. The First Circuit explained that the first criterion—protected activity—was not in dispute. *Id.* ("As Turner's filing of this and a prior lawsuit against RIDOC officials was constitutionally protected activity, the sufficiency of the allegations turns on the second and third elements." (citation omitted)). Therefore, the Court analyzes each theory as to the remaining elements: adverse action and causation.

## A. Classification

### 1. Adverse Action

The Court will accept for the purposes of this motion that the failure to reclassify Mr. Turner to a lower classification level is an adverse action. As the First Circuit acknowledged, this is a close question:

> While the denial of reclassification to a lower security level appears sufficient to allege adverse action because, according to Turner, his High Security classification subjected him to highly restrictive conditions of confinement which were not associated with other security classifications, whether the allegation of retaliatory animus is sufficient is debatable.

*Id.* at 3.

### 2. Causation

In discussing the causation element of Mr. Turner's retaliatory classification claim, the First Circuit explained that:

> Because the element of causation concerns defendants' states of mind, retaliatory intent typically is not susceptible to proof by direct evidence that can be averred in a complaint, and arguably conclusory allegations, such as a chronology that provides some support for an inference of retaliation, may be sufficient to survive Rule 12(b)(6) dismissal. Here,

> Turner's successful settlement of the prior lawsuit, which preceded the classification determinations, might provide some support for an inference of retaliation. Further support might be drawn from the fact that defendants twice overruled recommendations by the Classification Review Board to upgrade Turner's security status. However, documents attached to the pleadings also contain non-retaliatory justifications for some of the reclassification denials, and therefore tend to undermine any inference of a causal link. But the incorporated documents do not contain explanations for every classification determination during the relevant period, and to say that the claim is implausible because of the absence of evidence of causation may subject the complaint to a more stringent standard than called for at the pleading stage, particularly in a pro se action.

*Id.* at 3 (citations omitted).

The temporal relationship between the RIDOC classification decisions and Mr. Turner's settling of the 2006 suit is his only support for causation. A review of each of the classification decisions points singularly to the conclusion that there was no retaliatory discrimination by RIDOC.

As explained earlier, Rhode Island law establishes that the RIDOC Classification Board reviews each matter and makes recommendations to the RIDOC director, who has final authority to accept or reject the Board's recommendation. R.I. Gen. Laws § 42-56-31. In each of Mr. Turner's classifications, the uncontroverted evidence shows that Director Wall acted in compliance with his responsibilities and statutory authority, and without any discriminatory animus.

The Classification Board reviewed Mr. Turner on six occasions. *See* ECF No. 163-4 at 7–12. Throughout these meetings, Mr. Turner's case presented a conundrum to the Board. Mr. Turner had an acknowledged enemy housed in Maximum Security.[6]

---

[6] He also had an enemy in Medium Security for a while. *See* ECF No. 163-4 at 8.

While that enemy remained in Maximum Security, that classification was not an option for Mr. Turner. Moreover, RIDOC felt that a two-level decrease of classification to Medium Security was not in Mr. Turner's best interest, nor consistent with his security level. Mr. Turner agreed: he said that going directly to Medium "would be rough." ECF No. 163-10 at 2. Additionally, Mr. Turner was serving a life sentence for murder in the second degree and was not scheduled to make his first appearance before the Parole Board for a number of years. ECF No. 163-4 at 7.

Each time the Classification Board met, it set forth its logic and rationale for its recommendation:

First, on October 26, 2012, the Board noted that Mr. Turner had a known enemy issue in Maximum Security, but that "[s]ome Board Members believe[d] that the enemy [would] be removed." *Id.* The vote was four to one to recommend that RIDOC assign Mr. Turner to Maximum "pending removal of the enemy from the scene and verification . . . that the enemy situation does not exist." *Id.* The remaining board member "believe[d] that the enemy issue [was] there" and Maximum was not an option for the Turner. *Id.* The enemy issue was not resolved, and Mr. Turner remained at High Security.

Second, at the January 25, 2013 Classification Board meeting, the Board noted that Mr. Turner had enemy issues in both Maximum and Medium Security and therefore unanimously recommended that he remain at High Security.[7] *Id.* at 8.

---

[7] Mr. Turner had written to Warden Weeden, requesting that the Special Investigations Unit ("SIU") review his listed enemies. ECF No. 163-5 at 8. In that letter, Mr. Turner acknowledged that he and another inmate "could have issues if in the same building, he's a snake." Pursuant to his request, a SIU investigator

10

Third, on April 26, 2013, the Classification Board noted that Mr. Turner "[r]ecently came back from Virginia and is currently seeking out of state placement again."[8] *Id.* at 9. The Board then voted, two to one, to recommend that RIDOC upgrade Mr. Turner from High Security directly to Medium Security. The third board member voted to keep Mr. Turner at High Security. Upon review, Director Wall noted that Mr. Turner "score[d] Maximum but ha[d] an enemy there [and Mr. Turner was] many years from parole eligibility." *Id.* at 14. Accordingly, Director Wall determined that Mr. Turner should remain at High Security.

Fourth, at Mr. Turner's August 15, 2013 Classification Board review, the Board voted, two to one, that Mr. Turner remain at High Security, noting the ongoing enemy issue at Maximum Security and the length of Mr. Turner's sentence. *Id.* at 10.

Fifth, on November 14, 2013, the Board voted, three to one, to recommend that RIDOC transfer Mr. Turner directly to Medium Security, skipping Maximum Security, with the Board's chair dissenting. *Id.* at 12. The chair felt that Mr. Turner

---

interviewed the other inmate, who was housed at Maximum Security. The inmate indicated that there would be a "problem" if RIDOC housed Mr. Turner and him together. *Id.* at 5–6. The SIU investigator recommended that RIDOC not transfer Mr. Turner to Maximum Security.

[8] In February 2013, Mr. Turner began negotiating a deal with the Rhode Island Attorney General's Office. In exchange for Mr. Turner's testimony against a defendant in a pending state criminal prosecution, state prosecutors agreed to reach out to RIDOC in support of Mr. Turner's transfer to a correctional facility elsewhere in New England. ECF No. 163-7 at 5; ECF No. 163-9 at 2–5. In March 2013, state prosecutors decided against calling Mr. Turner to testify as a witness in the trial, negating the deal.

11

should remain in High Security. On November 26, 2013, Director Wall reviewed the Board's recommendation and denied it. Director Wall explained:

> We are in a bind. This inmate can't go to maximum and he is not parole eligible until 8/2024. His behavior while in Virginia was problematic. *Note: [High Security B] status w/ consideration for an out of state transfer.

*Id.* Following a discussion the next month, the Board unanimously agreed with Director Wall that Mr. Turner should continue at High Security. *Id.; see also id.* at 3 (citing enemy issues).

Sixth, the Board's final unanimous recommendation, issued February 25, 2014, was that RIDOC continue to assign Mr. Turner to High Security. The Board explained:

> Wayman Turner is serving a life sentence for murder II as of 8/20/2004. His risk score is 20. Subject has enemy issues . . . at Maximum Security, a codefendant. It's a level 1 enemy. He will meet in August of 2024. He was serving time in Virginia. Petitioned to come back to RI. That was granted and he arrived back here and finds himself in high security. He has no problems in this building. No recent bookings. He is doing quite well up here. In the past, subject has gotten the vote to go to medium security with some dissent and he has been denied each time. At today's board, subject states that [enemy] will not be a serious threat to him, nor he to [enemy]. SIU Begones will look into this situation and attempt to get [enemy] to sign off as an enemy. Therefore, today we are going to keep the vote the same. High Security B-status – but leave the door open for [future] possibility of going to Maximum Security.

*Id.* at 11.

Both times Director Wall denied the Board's recommendation, he explained his rationale. In April 2013, he stated that Mr. Turner scored for Maximum Security, but had enemies there; was years away from parole eligibility; and was awaiting out-of-state placement. *Id.* at 14. In November 2013, he acknowledged RIDOC was "in a

bind," but cited the same reasons as in April, with the addition that Mr. Turner had problematic behavior in Virginia. *Id.* at 15.

Mr. Turner's burden is to "prove that he would not have been transferred 'but for'" the filing of his lawsuit. *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979). "Moreover, the requirement of a 'but for' showing together with the wide latitude afforded prison officials in ordering transfers may make summary judgment particularly appropriate." *Id.* at 18–19. There is no evidence in the record to support a claim that Mr. Turner's filing of lawsuits in any way caused him to be subjected to a higher classification. RIDOC followed the statute concerning classification and set forth non-discriminatory reasons for its decisions. There is no evidence at all that any of the reasons given for the classifications are a pretext for discriminatory retaliation.

Mr. Turner has failed to prove that discriminatory retaliation caused his classifications.

### B. Transfer

As the First Circuit explained, a transfer to a faraway state for an inmate can be considered adverse action. *See* ECF No. 90 at 3 ("Turner alleges that the transfer to a distant facility made it impossible for his family to visit him and irreparably harmed his relationship with his children."). The question becomes whether the transfer was voluntary, and therefore, not adverse. At the time of its ruling vacating and remanding this Court's dismissal of the claim, the First Circuit said that the

13

Court will need to review the facts developed during discovery in order to properly evaluate this element:

> To the extent that Turner asserted that his transfer to Florida was retaliatory, the district court concluded that the transfer could not be considered adverse because it was not involuntary given that Turner admitted that he requested a transfer and signed transfer papers. But Turner says that he requested a transfer to another New England facility, not to Florida, and the transfer papers are not included in the documents appended to the pleadings. On the face of the pleadings and incorporated documents, it is not clear that the transfer to Florida was voluntary.

*Id.*

The evidence now shows that Mr. Turner's transfer was a direct result of his request to be transferred out of state. On April 24, 2014, Mr. Turner filed an "Inmate Request for Transfer Out of the State of Rhode Island." ECF No. 163-7 at 5. He authorized RIDOC to release his confidential information to other states. *Id.* at 6. The same day, Mr. Turner wrote to Director DiNitto about the transfer, "hop[ing] that [he will be kept] in the New England area." *Id.* at 8. He also acknowledged that RIDOC officials were "very disappointed with how [he] returned from Virginia," and that his request to transfer could result in his being returned to Virginia "or even further away."[9] *Id.*

Because of Mr. Turner's request, RIDOC officials prepared "his transfer package" and sent it to "other member states of the Interstate Corrections Compact." ECF No. 163-3 at 3. Mr. DiNitto does "not recall all of the states that Mr. Turner's

---

[9] One year earlier, Mr. Turner attempted to work a deal with state prosecutors in which he would be transferred within New England. That deal fell through. *See supra* note 8.

14

transfer package was sent to." *Id.* The Florida Department of Corrections was the first state to respond and indicated that they would accept Mr. Turner for transfer. ECF No. 163 at 4.

The Court finds that all of the evidence points to one conclusion: that the out-of-state transfer was a voluntary act by Mr. Turner, and therefore, not adverse action taken by RIDOC as retaliation.

Even if there were evidence that the transfer was an adverse action, Mr. Turner also fails to provide evidence of causation. The First Circuit noted that "the close temporal proximity of the transfer, coming just two months after the filing of this lawsuit, supports the allegation that the transfer was retaliatory." ECF No. 90; *see also McDonald*, 610 F.2d at 18 ("[An inmate] can be transferred for no reason at all. However, he may nevertheless establish a claim under § 1983 if the decision to transfer him was made by reason of his exercise of constitutionally protected First Amendment freedoms." (citations omitted)). But at the summary judgment stage, Mr. Turner needs more. He presents no evidence that his transfer was retaliatory; all of the evidence shows that Mr. Turner voluntarily requested a transfer out of Rhode Island, acknowledged that it could be to any state, and that RIDOC transferred him to Florida because it was the first state to respond to his request.

## IV. CONCLUSION

Mr. Turner has failed to set forth any evidence that the classification determinations made by RIDOC, or his transfer to Florida, were in any way motivated or caused by discriminatory retaliation for his having filed lawsuits against

15

the department. Therefore, the Court GRANTS the Defendants' Motion for Summary Judgment. ECF No. 162.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

August 24, 2018